# ANTONI SOLVUCA

## *vs.*

## RYAN & REILLY COMPANY.

*Workingmen's Compensation Act: the law of the land.  Jury trials; police power.*

The phrase "law of the land," as it occurs in the Constitution of Maryland, and the phrase "due process of law" in the Constitution of the United States, have the same purport.  p. 270

No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit.

p. 271

The common law bases an employer's liability for injuries to the employee on the ground of negligence; but negligence is merely disregard of some duty imposed by law, and the nature and extent of that duty may be modified by legislation, with corresponding change in the test of negligence, citing Mr. Justice Pitney in *N. Y. C. R. R.* v. *White*, 243 U. S. 188.  p. 271

"Particular rules of the common law affecting negligence are not placed by the Fourteenth Amendment of the Constitution of the United States beyond the reach of the law-making power of the State." *Ibid.*                               p. 274

Employers' liability acts, providing for the compensation of employees, while they "limit the freedom of employer and employee to agree respectively to the terms of employment" * * * "can not be supported except on the ground that it is a reasonable exercise of the police power of the State." *Ibid.*     p. 278

The Act of 1914, Chapter 800, provides for a jury trial on appeal from the Industrial Accident Commission, and therefore the law is not in violation of section 40 of Article 3, or of section 6 of Article 15 of the Constitution of the State, prohibiting the taking of property without just compensation agreed upon between the parties, or awarded by a jury, and

providing for the preservation of trial by jury of all issues of fact in civil proceedings.                    p. 281

   Where a law secures a trial by jury upon an appeal, it is no violation of the Constitution regarding that right, although such law may provide for a primary trial without the intervention of a jury.                    p. 281

   The Workmen's Compensation Law (Acts of 1914, Chapter 800), which was passed in the exercise of the police power of this State, creates a commission known as the State Industrial Accident Commission to administer the provisions of the Act. In the discharge of its duties and the exertion of its powers it is required to exercise judgment and discretion, and to apply the law to the facts in each particular case, but it is clear that the Legislature never intended to constitute the Commission a court, or to confer upon it the judicial power of the State, within the meaning of the constitutional provisions referred to; and the Act is constitutional.                    p. 283

   *Decided June 28th, 1917.*

   Appeal from the Court of Common Pleas of Baltimore City. (SOPER, C. J.)

   The facts are stated in the opinion of the Court.

   The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

   *David Ash,* for the appellant.

   *Edwin W. Wells,* submitted a brief for the appellee.

   *Albert C. Ritchie, the Attorney General,* submitted a brief for the State Industrial Accident Commission.

   THOMAS, J., delivered the opinion of the Court.

   This suit was brought by the appellant to recover for injuries received while in the employ of the appellee, and charged in the declaration to have been caused by its negligence. As we said in the first appeal (129 Md. 235), the *narr.,* on its face, presents a good cause of action, but the

defendant interposed the following plea: "that in conformity with the provisions of Chapter 800 of the Acts of 1914, generally known as the Employer's Compensation Act, this defendant, the Ryan & Reilly Company, exercised the option of securing compensation for its employees engaged in hazardous employments, as provided in section 15, and sub-section 3, of said Act. That by an order of the State Industrial Accident Commission passed the 28th day of January, 1915, and which continued in effect until the 15th day of January, 1916, this defendant was permitted to carry its compensation risk as a self-insurer, having established its financial ability to assume the payment of the compensation required. That on the 26th day of February, 1915, the date of the alleged injury to the plaintiff in this cause, said order was in effect, and the defendant—had thereby secured compensation to this employee who was injured while in a hazardous employment, and the defendant fully complied with the provisions of the Compensation Act as provided by section 15, sub-section 3 of said Act." The plaintiff demurred to this plea. It is not suggested that the plea is defective in form, but the purpose of the demurrer was to challenge the constitutionality of the Act, which, it is claimed, contravenes the Fourteenth Amendment and Article 7 of the Constitution of the United States and the Declaration of Rights and Constitution of this State.

This Act, commonly called the Workmen's Compensation Act, declares in its preamble that the State "recognizes that the prosecution of various industrial enterprises which must be relied upon to create and preserve the wealth and prosperity of the State involves injury to large numbers of workmen, resulting in their partial or total incapacity or death, and that under the rules of the common law and the provisions of the statutes now in force an unequal burden is cast upon its citizens, and that in determining the responsibility of the employer on account of injuries sustained by his workmen, great and unnecessary cost is now incurred in litigation, which cost is born by the workmen, the employers and taxpayers, in part, in the maintenance of courts and juries to

determine the question of responsibility under the law as it now exists;—and, in addition thereto, the State and its tax-payers are subjected to a heavy burden in providing care and support for such injured workmen and their dependents, which burden should, in so far as may be consistent with the rights and obligations of the people of the State, be more fairly distributed as in this Act provided;" and that "where-as, the common law system governing the remedy of work-men against employers for injuries received in extra-hazard-ous work is inconsistent with modern industrial conditions; and injuries in such work, formerly occasional, have now become frequent and inevitable," therefore "the State of Maryland, exercising herein its police and soverign powers, declares that all phases of extra-hazardous employments be, and they are hereby withdrawn for private controversy, and sure and certain relief for workmen injured in extra-hazard-ous employments and their families and dependants are here-by provided for, regardless of questions of fault, and to the exclusion of every other remedy, except as provided in this Act."

The Act creates a Commission to administer the law; authorizes it, for the purpose contemplated by the Act, to require the attendance of witnesses and the production of books, payrolls, documents and testimony, and to apply to any judge of the Supreme Bench of Baltimore City, or of the Circuit Court of any county for a rule on any witness refusing to testify or to produce a book or paper, to show cause why he should not be committed to jail; to adopt rea-sonable and proper rules to govern its procedure, and pro-vides that the Commission shall not be bound by the usual common law or statutory rules of evidence, or by any tech-nical or formal rule of procedure, but may make the investi-gation in such manner as in its judgment is best calculated to ascertain the substantial rights of the parties and to carry out justly the spirit of the Act. The Commission is required to make annually a report to the Governor, of the number of awards made by it, the causes of the accidents, and a

detail statement of its expenses and of the condition of the
State Accident Fund (therein provided for), together with
any other matter it may deem proper to report. Every em-
ployer is required to pay or provide, as required by the Act,
compensation, according to the schedule contained therein,
"for the disability or death of his employee resulting from
an accidental personal injury sustained by the employee aris-
ing out of and in the course of his employment, without re-
gard to fault as a cause of such injury, except where the
injury is occasioned by the willful intention" of the employee
to bring about the injury or death of himself or of others, or
where the injury results solely from the intoxication of the
employee while on duty. The liability prescribed above is
exclusive, provided that if the employer shall fail to secure
the payment of compensation as provided in the Act, an in-
jured employee, or his legal representatives in case death
results from the injury, "may, at his option, elect to claim
compensation" under the Act, or to maintain an action in the
courts for damages, in which action the defendant shall not
plead as a defence that the injury was caused by the neg-
ligence of a fellow servant, or the negligence of the employee,
or that the employee assumed the risk of the employment.
The employer is required to secure the compensation pro-
vided by the Act, (1) by insuring the payment of the same
in the State Accident Fund; (2) by insuring the payments
in any stock corporation or mutual association authorized to
transact the business of workmen's compensation insurance
in the State; or (3), if he does not voluntarily adopt one of
the above methods, by furnishing the Commission with satis-
factory proof of his ability to pay such compensation, and
depositing, when required to do so, with the Commission
securities in an amount to be determined by the Commission,
to secure his liability. Provision is made for the establish-
ment of a fund called the State Accident Fund, to insure
employers against liability, and payment to employees and
their dependents of the compensation specified. A great
number of employments are specified as extra-hazardous, and

the Act is made to apply to all other extra-hazardous employments. Compensation is allowed for temporary and permanent, and for partial and total disability according to the schedule contained in the Act, and provision is made for compensation to dependents where the injury results in the death of the employee. An appeal is allowed from the decision of the Commission to the circuit courts or the common law courts of Baltimore City by an employer, employee, beneficiary, or person feeling aggrieved by such decision, and provision is made for trial by jury in the courts of issues of fact, and for the reversal or modification by the Court of the decision of the Commission, in accordance with the law and facts, and for a further appeal from the judgment of the Circuit Court or common law Court of Baltimore City to this Court.

All of the questions raised by the demurrer, except the two to which we shall hereafter refer, are so fully covered by recent decisions of the Supreme Court of the United States, and by a recent decision of this Court, that it would be useless to undertake a further discussion of them here.

We have frequently said that "the law of the land," in the Constitution of this State, and "due process of law," in the Constitution of the United States, mean the same thing. *Balimore Belt R. R. Co.* v. *Baltzell,* 75 Md. 94; *Public S. Com.* v. *N. C. Rwy. Co.,* 122 Md. 355. In the case of *New York Central R. R. Co.* v. *White,* 243 U. S. 188, decided March 6th, 1917, MR. JUSTICE PITNEY, in delivering the opinion of the Supreme Court, after reviewing the provisions of the Workmen's Compensation Law of New York, which are like those of our statute, said: "The scheme of the Act is so wide a departure from common law standards respecting the responsibility of employer to employee that doubts naturally have been raised respecting its constitutional validity. The adverse considerations urged or suggested in this case and in kindred cases submitted at the same time are: (*a*) that the employer's property is taken without due process of law, because he is subjected to a liability for compensation without regard to any neglect or default on his

part or on the part of any other person for whom he is re-
sponsible, and in spite of the fact that the injury may be
solely attributable to the fault of the employee; (*b*) that the
employee's rights are interfered with, in that he is prevented
from having compensation for injuries arising from the em-
ployer's fault commensurate with the damages actually sus-
tained, and is limited to the measure of compensation pre-
scribed by the Act; and (*c*) that both employer and em-
ployee are deprived of their liberty to acquire property by
being prevented from making such agreement as they choose
respecting the terms of the employment.

"In considering the constitutional question, it is necessary
to view the matter from the standpoint of the employee as
well as from that of the employer. For, while plaintiff in
error is an employer, and can not succeed without showing
that its rights as such are infringed;—yet, as pointed out
by the Court of Appeals in the *Jensen* v. *So. Pac. Co.,* 215
N. Y. 526, the exemption from further liability is an es-
sential part of the scheme, so that the statute if invalid as
against the employee is invalid as against the employer.

"The close relation of the rules govering responsibility as
between employer and employee to the fundamental rights of
liberty and property is of course recognized. But those rules,
as guides of conduct, are not beyond alteration by legislation
in the public interest. No person has a vested interest in
any rule of law entitling him to insist that it shall remain
unchanged for his benefit. * * * The common law bases the
employer's liability for injuries to the employee upon the
ground of negligence; but negligence is merely the disregard
of some duty imposed by law; and the nature and extent of
the duty may be modified by legislation, with corresponding
change in the test of negligence. Indeed, liability may be
imposed for the consequences of a failure to comply with a
statutory duty, irrespective of negligence in the ordinary
sense; safety appliance acts being a familiar instance. * * *

"The fault may be that of the employer himself, or—most
frequently—that of another for whose conduct he is made

responsible according to the maxim *respondeat superior.* In the latter case the employer may be entirely blameless, may have exercised the utmost human foresight to safeguard the employee; yet, if the *alter ego* while acting within the scope of his duties be negligent—in disobedience, it may be, of the employers positive and specific command—the employer is answerable for the consequences. It can not be that the rule embodied in the maxim is unalterable by legislation.

"The immunity of the employer from responsibility to an employee for the negligence of a fellow employee is of comparatively recent origin, it being the product of the judicial conception that the probability of a fellow workman's negligence is one of the natural and ordinary risks of the occupation, assumed by the employee and presumably taken into account in the fixing of his wages. * * * The doctrine has prevailed generally throughout the United States, but with material differences in different jurisdictions respecting who should be deemed a fellow servant and who a vice-principal or *alter ego* of the master, turning sometimes upon refined distinctions as to grades and departments in the employment. * * * It needs no argument to show that such a rule is subject to modification or abrogation by a State upon proper occasion.

"The same may be said with respect to the general doctrine of assumption of risk. By the common law the employee assumes the risks normally incident to the occupation in which he voluntarily engages; other and extraordinary risks and those due to the employer's negligence he does not assume until made aware of them, or until they become so obvious that an ordinarily prudent man would observe and appreciate them, in either of which cases he does assume them, if he continue in the employment without obtaining from the employer an assurance that the matter will be remedied; but if he receive such an assurance, then, pending performance of the promise, the employee does not in ordinary cases assume the special risk. * * * Plainly, these rules, as guides of conduct and tests of liability, are subject to change in the exercise of the sovereign authority of the State.

"So, also, with respect to contributory negligence. Aside from injuries intentionally self-inflicted, for which the statute under consideration affords no compensation, it is plain that the rules of law upon the subject, in their bearing upon the employer's responsibility, are subject to legislative change; for contributory negligence, again, involves a default in some duty resting in the employee, and his duties are subject to modification.

"It may be added, by way of reminder, that the entire matter of liability for death caused by wrongful act, both within and without the relation of employer and employee, is a modern statutory innovation, in which the States differ as to who may sue, for whose benefit, and the measure of damages.

"But it is not necessary to extend the discussion. This Court repeatedly has upheld the authority of the States to establish by legislation departures from the fellow-servant rule and other common-law rules affecting the employer's liability for personal injuries to the employee. * * * The statute under consideration sets aside one body of rules only to establish another system in its place. If the employee is no longer able to recover as much as before in case of being injured through the employer's negligence, he is entitled to moderate compensation in all cases of injury, and has a certain and speedy remedy without the difficulty and expense of establishing negligence or proving the amount of the damages. Instead of assuming the entire consequences of all ordinary risks of the occupation, he assumes the consequences, in excess of the scheduled compensation, of risks ordinary and extraordinary. On the other hand, if the employer is left without defense respecting the question of fault, he at the same time is assured that the recovery is limited, and that it goes directly to the relief of the designated beneficiary. And just as the employee's assumption of ordinary risks at common law presumably was taken into account in fixing the rate of wages, so the fixed responsibility of the employer, and the modified assumption of risk by the employee under the

new system, presumably will be reflected in the wage scale. The act evidently is intended as a just settlement of a difficult problem affecting one of the most important of social relations, and it is to be judged in its entirety. We have said enough to demonstrate that, in such an adjustment, the particular rules of the common law affecting the subject matter are not placed by the Fourteenth Amendment beyond the reach of the law making power of the State; and thus we are brought to the question whether the method of compensation that is established as a substitute transcends the limits of permissible state action.

"We will consider, first, the scheme of compensation, deferring for the present the question of the manner in which the employer is required to secure payment.

"Briefly, the statute imposes liability upon the employer to make compensation for disability or death of the employee resulting from accidental personal injury arising out of and in the course of the employment, without regard to fault as a cause except where the injury or death is occasioned by the employee's willful intention to produce it, or where the injury results solely from his intoxication while on duty; it graduates the compensation for disability according to a prescribed scale based upon the loss of earning power, having regard to the previous wage and the character and duration of the disability; and measures the death benefit according to the dependency of the surviving wife, husband, or infant children. Perhaps we should add that it has no retrospective effect, and applies only to cases arising some months after its passage.

"Of course, we can not ignore the question whether the new arrangement is arbitrary and unreasonable, from the standpoint of natural justice. Respecting this, it is important to be observed that the act applies only to disabling or fatal personal injuries received in the course of hazardous employment in gainful occupation. Reduced to its elements, the situation to be dealt with is this: Employer and employee, by mutual consent, engage in a common operation in-

tended to be advantageous to both; the employee is to contribute his personal services, and for these is to receive wages, and ordinarily nothing more; the employer is to furnish plant, facilities, organization, capital, credit, is to control and manage the operation, paying the wages and other expenses, disposing of the product at such prices as he can obtain, taking all the profits, if any there be, and of necessity bearing the entire losses. In the nature of things, there is more or less of a probability that the employee may lose his life through some accidental injury arising out of the employment, leaving his widow or children deprived of their natural support; or that he may sustain an injury not mortal but resulting in his total or partial disablement, temporary or permanent, with corresponding impairment of earning capacity. The physical suffering must be borne by the employee alone; the laws of nature prevent this from being evaded or shifted to another, and the statute makes no attempt to afford an equivalent in compensation. But, besides, there is the loss of earning power; a loss of that which stands to the employee as his capital in trade. This is a loss arising out of the business, and, however it may be charged up, is an expense of the operation, as truly as the cost of repairing broken machinery or any other expense that ordinarily is paid by the employer. Who is to bear the charge? It is plain that, on grounds of natural justice, it is not unreasonable for the State, while relieving the employer from responsibility for damages measured by common-law standards and payable in case where he or those for whose conduct he is answerable are found to be at fault, to require him to contribute a reasonable amount, and according to a reasonable and definite scale, by way of compensation for the loss of earning power incurred in the common enterprise, irrespective of the question of negligence, instead of leaving the entire loss to rest where it may chance to fall—that is, upon the injured employee or his dependents. Nor can it be deemed arbitrary and unreasonable, from the standpoint of the employee's interest, to supplant a system under which he

assumed the entire risk of injury in ordinary cases, and in others had a right to recover an amount more or less speculative upon proving facts of negligence that often were difficult to prove, and substitute a system under which in all ordinary cases of accidental injury he is sure of a definite and easily ascertained compensation, not being obliged to assume the entire loss in any case but in all cases assuming any loss beyond the prescribed scale.

"Much emphasis is laid upon the criticism that the act creates liability without fault. This is sufficiently answered by what has been said, but we may add that liability without fault is not a novelty in the law. The common-law liability of the carrier, of the inn-keeper, of him who employed fire or other dangerous agency or harbored a mischievous animal, was not dependent altogether upon questions of fault or negligence. Statutes imposing liability without fault have been sustained. * * *

"We have referred to the maxim *respondeat superior.* In a well-known English case, *Hall* v. *Smith,* 2 Bing. 156, 160, this maxim was said by BEST, C. J., to be 'bottomed on this principle, that he who expects to derive advantage from an act which is done by another for him, must answer for any injury which a third person may sustain from it.' And this view has been adopted in New York. *Cardot* v. *Barney,* 63 N. Y. 281, 287. The provision for compulsory compensation, in the act under consideration, can not be deemed to be an arbitrary and unreasonable application of the principle, so as to amount to a deprivation of the employer's property without due process of law. The pecuniary loss resulting from the employee's death or disablement must fall somewhere. It results from something done in the course of an operation from which the employer expects to derive a profit. In excluding the question of fault as a cause of the injury, the act in effect disregards the proximate cause and looks to one more remote—the primary cause, as it may be deemed—and that is, the employment itself. For this, both parties are responsible, since they voluntarily engage in it as co-

adventurers, with personal injury to the employee as a probable and foreseen result. In ignoring any possible negligence of the employee producing or contributing to the injury, the lawmaker reasonably may have been influenced by the belief that in modern industry the utmost diligence in the employer's service is in some degree inconsistent with adequate care on the part of the employee for his own safety; that the more intently he devotes himself to the work, the less he can take precautions for his own security. And it is evident that the consequences of a disabling or fatal injury are precisely the same to the parties immediately affected, and to the community, whether the proximate cause be culpable or innocent. Viewing the entire matter, it can not be pronounced arbitrary and unreasonable for the State to impose upon the employer the absolute duty of making a moderate and definite compensation in money to every disabled employee, or in case of his death to those who were entitled to look to him for support, in lieu of the common-law liability confined to cases of negligence.

"But, it is said, the statute strikes at the fundamentals of constitutional freedom of contract; and we are referred to two recent declarations by this Court. The first is this: 'Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment, by which labor and other services are exchanged for money or other forms of property. If this right be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established constitutional sense.' *Coppage* v. *Kansas,* 236 U. S. 1, 14. And this is the other: 'It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the (Fourteenth) Amendment to secure.' *Truax* v. *Raich,* 239 U. S. 33, 41.

"It is not our purpose to qualify or weaken either of these declarations in the least. And we recognize that the legislation under review does measurably limit the freedom of employer and employee to agree respecting the terms of employment, and that it can not be supported except on the ground that it is a reasonable exercise of the police power of the State. In our opinion it is fairly supportable upon that ground. And for this reason: The subject-matter in respect of which freedom of contract is restricted is the matter of compensation for human life or limb lost or disability incurred in the course of hazardous employment, and the public has a direct interest in this as affecting the common welfare. 'The whole is no greater than the sum of all the parts, and when the individual health, safety and welfare are sacrificed or neglected, the State must suffer.' *Holden* v. *Hardy,* 169 U. S. 366, 397. It cannot be doubted that the State may prohibit and punish self-maiming and attempts at suicide; it may prohibit a man from bartering away his life or his personal security; indeed, the right to these is often declared, in bills of rights, to be 'natural and inalienable'; and the authority to prohibit contracts made in derogation of a lawfully established policy of the State respecting compensation for accidental death or disabling personal injury is equally clear. * * * This statute does not concern itself with measures of prevention, which presumably are embraced in other laws. But the interest of the public is not confined to these. One of the grounds of its concern with the continued life and earning power of the individual is its interest in the prevention of pauperism, with its concomitants of vice and crime. And, in our opinion, laws regulating the responsibility of employers for the injury or death of employees arising out of the employment bear so close a relation to the protection of the lives and safety of those concerned that they properly may be regarded as coming within the category of police regulations. * * *

"No question is made but that the procedural provisions of the act are amply adequate to afford the notice and op-

portunity to be heard required by the Fourteenth Amendment. * * *

"The objection under the 'equal protection' clause is not pressed. The only apparent basis for it is in exclusion of farm laborers and domestic servants from the scheme. But, manifestly, this cannot be judicially declared to be an arbitrary classification, since it reasonably may be considered that the risks inherent in these occupations are exceptionally patent, simple, and familiar. * * *

"We conclude that the prescribed scheme of compulsory compensation is not repugnant to the provisions of the Fourteenth Amendment, and are brought to consider, next, the manner in which the employer is required to secure payment of the compensation. By section 50, this may be done in one of three ways: (*a*) State insurance; (*b*) insurance with an authorized insurance corporation or association, or (*c*) by a deposit of securities. * * *

"The system of compulsory compensation having been found to be within the power of the State, it is within the limits of permissible regulation, in aid of the system, to require the employer to furnish satisfactory proof of his financial ability to pay the compensation, and to deposit a reasonable amount of securities for that purpose. The third clause of section 50 has not been, and presumably will not be, construed so as to give an unbridled discretion to the commission; nor is it to be presumed that solvent employers will be prevented from becoming self-insurers on reasonable terms. * * *

"This being so, it is obvious that this case presents no question as to whether the State might, consistently with the Fourteenth Amendment, compel employers to effect insurance according to either of the plans mentioned in the first and second clauses. There is no such compulsion, since self-insurance under the third clause presumably is open to all employers on reasonable terms that it is within the power of the State to impose. Regarded as optional arrangements, for acceptance or rejection by employers unwilling to comply

with that clause, the plans of insurance are unexceptionable from the constitutional standpoint. Manifestly, the employee is not injuriously affected in a constitutional sense by the provisions giving to the employer an option to secure payment of the compensation in either of the modes prescribed, for there is no presumption that either will prove inadequate to safeguard the employee's interests." See also *Hawkins* v. *Bleakly,* 243 U. S. 210; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219; *Jensen* v. *Southern Pacific Co.,* 215 N. Y. 514; 109 N. E. 600; *State* v. *Clausen,* 117 Pac. 1101; *State* v. *Creamer,* 85 Ohio St. Rep. 349; *Day* v. *State,* 7 Gill, 321.

In the case of *Am. Coal Co.* v. *Allegany Co.,* 128 Md. 564, the Act of 1910, Chap. 153, as amended by the Act of 1912, Chap. 445, which provides for the creation of a "Minors and Operators Co-operative Relief Fund" for the relief of employees injured in coal and clay mining in Allegany and Garrett Counties and the dependents of employees injured or killed in such mining, was attacked on the several grounds mainly relied on by the appellant in this case, but this Court held that the Act was free from the constitutional objections urged against it, and well within the police power of the State. In the course of the opinion JUDGE BURKE said: "There can be no doubt that the Legislature intended by the Act of 1910, Chap. 153, to change the rules of the common law, in the classes of industry referred to in the Act, theretofore prevailing in this State governing the recovery for work accidents. It may be said that it is now generally recognized that the application of the old rules governing the relation of master and servant in certain classes of occupation are unsuitable to our changed industrial and corporate condition. The application of the principles of the common law to suits for personal injuries sustained in hazardous employments resulted in many cases in injustice to the parties concerned as well as to the State. It filled the courts with litigation; it became the fruitful source of perjury; it engendered bitterness between employer and employee; it re-

sulted in great economic waste, and it turned out an army of maimed and helpless people as dependents upon the charity of friends or the public.   The operation of these rules came to be regarded as 'foolish, wasteful, inefficient, and barbarous,' and the national Government and a number of the States have now replaced them by efficient and humane laws."

The appellant further insists that the Act in question violates section 40 of Article 3 and section 6 of Article 15 of the Constitution of this State, prohibiting the taking of property without just compensation agreed upon between the parties, or awarded by a jury, and providing for the preservation of trial by jury of all issues of fact in civil proceedings. The Act expressly provides for a jury trial on appeals from orders of the Commission, and in the case of *Frazier* v. *Leas,* 127 Md. 572, this Court held that on appeal either party had the right to call witnesses in support of his case, and that the Legislature evidently intended to secure the party appealing the benefit of section 6, Article 15 of the Constitution, providing for trial by jury of all issues of fact in civil proceedings, etc.   In the case of *Steuart* v. *Baltimore,* 7 Md. 500, the Court said: "These cases fully establish the principle, that where a law secures the trial by jury upon an appeal, it is no violation of a constitutional provision for guarding that right, although such law may provide for a primary trial without the intervention of a jury.   This is upon the ground that the party, if he thinks proper, can have his case decided by a jury before it is finally settled," and in the case of *Ulman* v. *Baltimore,* 72 Md. 609, JUDGE McSHERRY, speaking for the Court, said: "Had the Act of 1874 (Chap. 218) gone further and empowered the city to make provision by ordinance for giving notice to, and allowing a hearing of, the parties to be affected by the paving of a street, either before the city commissioner, or some other local tribunal, and then, for an appeal to the City Court where a trial by jury could be had, it can not be doubted that the proceedings would have been in accord with both the Federal and State Constitutions.

*Steuart* v. *Baltimore*, 7 Md. 500; *Davidson* v. *New Orleans*, 96 U. S. 97."

It is also urged on behalf of the appellant that the Act contravenes the provision of section 1 of Article 4 of the Constitution of the State, which vests the judicial power of the State in the Court of Appeals, Circuit Court, Orphans' Court, and the courts for Baltimore City provided for in said Article, and Article 8 of the Declaration of Rights, which declares that "the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other."

It is said in 6 R. C. L. 159: "The distinction between legislative or ministerial functions and judicial functions is difficult to point out. What is a judicial function does not depend solely on the mental operation by which it is performed or the importance of the Act. In solving this question, due regard must be had to the organic law of the state and the division of powers of government. In the discharge of executive and legislative duties, the exercise of discretion and judgment of the highest order is necessary, and matters of the greatest weight and importance are dealt with. It is not enough to make a function judicial that it requires discretion, deliberation, thought, and judgment. It must be the exercise of discretion and judgment within the subdivision of the sovereign power which belongs to the judiciary, or, at least, which does not belong to the legislative or executive department. If the matter, in respect to which it is exercised, belongs, to either of the two last-named departments of government, it is not judicial. As to what is judicial and what is not, seems to be better indicated by the nature of a thing than its definition." In the case of *Shafer* v. *Mumma*, 17 Md. 331, CHIEF JUDGE LEGRAND said: "But it is said, on behalf of the plaintiffs, that since the adoption of the present State Constitution, the Mayor of Hagerstown could not try and fine under the ordinance because the exercise of such power is but the exertion of the *judicial* power, which, by the Constitution, is confined to certain special classes of

persons, and that the Mayor of Hagerstown is not included
in the enumeration.

"This argument would be entitled to great weight, if we
thought the power exercised by the defendant was, in the
sense of the Constitution, a part of the judicial power. But
we entertain no such opinion. We regard it as but a part of
the *police power,* as contradistinguished from the regular
judiciary powers of the State. From time immemorial a dis-
tinction has been observed between the two, both in England
and this country. It would be next to, if not quite impossi-
ble, for a large city like Baltimore to preserve order within
its limits, preserve the streets free from interruption, indeed
to do most of the thousand things necessary to be done, to
carry on its various and indispensable operations, if in every
case it were a necessary preliminary that the offender should
be regularly prosecuted by presentment, indictment, and trial.
It has always been understood that, under the police power,
persons disturbing the public peace, persons guilty of a nui-
sance, or obstructing the public highways, and the like of-
fenses, may be summarily arrested and fined, without any
infraction of that part of the Constitution which apportions
the administration of the judicial power, strictly as such.
We regard the power conferred on the corporation of Hagers-
town, to summarily punish persons of the description the
appellant, Elmira, is admitted to have been, as falling di-
rectly within the definition of a police regulation." The
same objection was urged against the Workmen's Compensa-
tion Law of Wisconsin, but the Supreme Court of Wisconsin,
in *Borgnis* v. *Falk Co.,* 133 N. W. 209, sustained the Act,
and said in reference to that objection: "The next import-
ant contention is that the law is unconstitutional because it
vests judicial power in a body which is not a Court and is
not composed of men elected by the people, in violation of
those clauses of the State Constitution which vest the judicial
power in certain courts and provide for the election of judges
by the people, as well as in violation of the constitutional
guaranties of the due process of law. It was suggested at the

argument that the Industrial Commission might perhaps be held to be a Court of conciliation, as authorized to be created by section 16 of Article 7 of the State Constitution; but we do not find it necessary to consider or decide this contention. We do not consider the Industrial Commission a Court, nor do we construe the act as vesting in the commission judicial powers within the meaning of the Constitution. It is an administrative body or arm of the government, which in the course of its administration of a law is empowered to ascertain some questions of fact and apply the existing law thereto, and in so doing acts quasi judicially; but it is not thereby vested with judicial power in the constitutional sense.

"There are many such administrative bodies or commissions, and with the increasing complexity of modern government they seem likely to increase rather than diminish. Examples may be easily thought of. Town boards, boards of health, boards of review, boards of equalization, railroad rate commissions and public utility commissions all come within this class. They perform very important duties in our scheme of government, but they are not Legislatures or Courts."

The Workmen's Compensation Law, which was passed in the exercise of the police power of this State, creates a commission known as the State Industrial Accident Commission to administer the provisions of the Act. In the discharge of its duties and the exertion of its powers it is required to exercise judgment and discretion, and to apply the law to the facts in each particular case, but it is clear that the Legislature never intended to constitute the Commission a Court, or to confer upon it the judicial power of the State within the meaning of the constitutional provisions referred to.

It follows from the views we have expressed that the demurrer to the plea of the defendant was properly overruled, and that the judgment of the Court below must be affirmed.

*Judgment affirmed, with costs.*